Filed 5/22/14  P. v. Harris CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CAROL LAVERN HARRIS,<br><br>Defendant and Appellant. | F065104<br><br>(Super. Ct. No. 1251412)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Nancy Ashley, Judge.

Law Office of Joseph O'Sullivan, Joseph D. O'Sullivan and Patrick A. Swillinger for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Eric L. Christoffersen, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Carol Lavern Harris (defendant) was charged, by information filed January 15, 2010, with premeditated murder. (Pen. Code,[1] § 187, subd. (a); count I.)[2] She was convicted, following a jury trial, of second degree murder. Her motion for a new trial or reduction of the offense to manslaughter was denied, and she was sentenced to 15 years to life in prison and ordered to pay various fees, fines, and assessments.

Defendant now raises claims of insufficient evidence, trial court error, prosecutorial misconduct, and ineffective assistance of counsel. We hold: (1) The evidence was sufficient to sustain the jury's verdict; (2) The trial court did not improperly allow a particular witness to testify as an expert; (3) The prosecutor did not commit prejudicial misconduct; and (4) The record on appeal fails to establish ineffective assistance of counsel. Accordingly, we affirm.

## FACTS[3]

### I

#### PROSECUTION EVIDENCE

Desamona Crowder and Dasheme had a child together.[4] In August, Crowder frequented an apartment in San Leandro where Dasheme lived with Alisia Brown. On

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] Defendant's son, Dasheme Hosley, was also charged with premeditated murder in count I, and was the subject of various enhancement allegations. He and defendant were tried separately. Count II of the information charged defendant's other son, Deleon Hosley, and Alisia Brown with being accessories. (§ 32.) Only defendant's case is before us on this appeal.

For clarity, we refer to the Hosley brothers by their first names. No disrespect is intended.

[3] Unspecified references to dates in the statement of facts are to dates in 2008.

[4] Crowder initially was charged with murder in connection with this case, but entered into an agreement to testify in return for which she would plead guilty to being an accessory and be sentenced to a year in the county jail.

2.

the night in question, Crowder, Dasheme, their daughter, Brown, and Lamar Vincent were at the apartment.[5]  Crowder and Dasheme were using cocaine.

At some point during the evening, Dasheme received a telephone call.  When he hung up, he said it was defendant and that she was crying.  He became upset and angry, because the phone call ended or was dropped before he could get the complete story, so he did not know what was wrong.  Crowder knew, from having been hit by Dasheme before, that he could be violent when angry and that anything could upset him.  Crowder had discussed with defendant the fact Dasheme would sometimes become violent and hit Crowder.

Dasheme told Crowder to call George Willoughby, because they were going to go to Modesto.  When Willoughby did not answer his phone, Crowder texted him.  Willoughby called Dasheme about 30 minutes later.  When Willoughby arrived at the apartment, Dasheme, Crowder, and Vincent got in his car.  Crowder knew they were going to Modesto, because she heard Dasheme say he wanted to check on his mother and see if she was okay.  At some point before they left, Dasheme asked, "Why did she call me and tell me this?  What did she think I was going to do?"

During the drive to Modesto, Dasheme called defendant to tell her they were on the way.  Crowder believed defendant told Dasheme things had worked out and it was just a gin night, because she heard Dasheme repeating that to someone.  Crowder believed defendant knew Dasheme was coming, however, because Dasheme said he was not satisfied and was still going to come and check on defendant.

During the drive, Crowder heard Dasheme say defendant had called because Karl Johnson (defendant's husband) was putting hands on her.  He said he wanted to know if defendant was all right or in trouble, because when he called, no one answered the

---

**5**    In her direct examination of Crowder, the prosecutor forgot to elicit the exact date. Other trial evidence clarified it was the night of August 29 to August 30.

3.

phone.[6]  Dasheme tried, unsuccessfully, to get Alfred Newton to physically check on defendant.  Crowder believed Newton told Dasheme he had spoken to defendant and she was okay.[7]  Dasheme also got a called from Robert Barnes, saying everything was okay.  Dasheme talked to Deleon and said Johnson had hit defendant and Dasheme was going to go check on her.

During the drive to Modesto, Crowder saw Dasheme holding a silver gun she had seen in his possession on prior occasions.  She heard clicking noises and also saw him spinning the gun's cylinder.  Crowder was worried the gun might go off in the car.  She was also concerned Dasheme might shoot Johnson, so she began to pray.

Once at defendant's house, everyone got out of the car.  Crowder rang the doorbell and Dasheme knocked on the door.  After about five minutes, Johnson came downstairs and answered the door.  He said, "What's up?"  Dasheme replied, "What do you mean what's up?"  He was upset and shocked that Johnson had answered the door.

Johnson was standing in the doorway inside the house, and Dasheme was outside.  Dasheme was holding the gun in his right hand, tucked close to his body.  Crowder saw a

---

[6]    During the trip, defendant called Crowder's cell phone.  Crowder missed the call.

Crowder considered Johnson a nice person.  She could not recall ever hearing him raise his voice.  She had seen defendant and Johnson argue, however.  Defendant sometimes threatened to hit Johnson or said her sons would take care of him instead of her fighting.  Crowder never saw Johnson strike defendant.

[7]    Newton, who was in Stockton on the night in question, spoke to defendant sometime around 1:00 a.m.  Defendant was crying and said she and Johnson had had a dispute.  Because Newton made it a habit not to get involved in domestic matters, the conversation pretty much ended.  Newton then called back and spoke with Johnson.  Johnson explained he never put his hands on defendant, although he had to push her off of him.  He said they were a little tipsy, and she was just mad and being overdramatic and turning over some furniture.  Defendant later called Newton back to admit Johnson had not really "jump[ed] on her or anything like that," but they had been fighting and she had been scared.  Newton advised her to call Dasheme, because Dasheme thought Johnson "jumped on" defendant.  Later, Newton called Dasheme to tell him he had spoken to defendant, but Dasheme never answered the phone.

4.

flash. Dasheme then went into the house and stood over Johnson. Johnson said he did not want to die. He was slumped over on the floor by the living room couch, holding his stomach, and Dasheme was pointing the gun at his face. Johnson was pleading for his life. Defendant was screaming and crying.[8] She pushed Dasheme out of the way, told him to get out, and asked him what he had done. Crowder ran to the car and called to Dasheme to come on.

After the shooting, Dasheme and Crowder stayed in several different hotels in Hayward. Defendant assisted the couple in moving from one hotel to another and apparently paid the bill for at least one hotel.

Willoughby considered defendant his grandmother, as she and his grandfather once were married.[9] In 2008, he worked security at after-hours club affairs.

On August 30, Willoughby started work at 1:30 a.m. At some point, he saw he had an urgent message to call Crowder. When Willoughby returned the call, Dasheme answered and said they had to go to Modesto because someone was beating on his mother.

Willoughby picked up Dasheme, Crowder, and Vincent, and they headed for Modesto. Willoughby did not talk to defendant that night or confirm with anyone whether defendant was, in fact, being beaten.[10] He did not know anyone was going to be

---

[8]     Crowder told Detective Owen defendant was four to five feet behind Johnson when Dasheme fired.

[9]     Willoughby initially was charged with murder in connection with this case, but entered into an agreement to testify in return for which he would plead guilty to being an accessory and receive a year in the county jail. At some point after his arrest, Willoughby received a letter from Dasheme, telling him to "take the hit," meaning take the rap. Defendant also sent Willoughby a letter, saying they needed to stay "prayerful."

[10]    Willoughby considered Johnson "a good dude" who appeared to get along with people. Willoughby did not know of any incidents in which Johnson hurt defendant or was involved in a physical altercation with someone. There were instances, however, in which Willoughby was contacted by defendant and asked to find Johnson because he was

5.

killed. During the drive, Dasheme was on the phone. Willoughby heard him say he was "coming up there." Dasheme was involved in about three phone calls during the trip, but Willoughby did not know to whom Dasheme spoke or hear anything else that was said. However, he saw Dasheme dump bullets of different calibers into his hand from out of a sock, then pick out five or six .38-caliber rounds. Prior to this night, Willoughby had seen Dasheme with a silver .38-caliber revolver. After this night, Willoughby did not see that gun again.

Willoughby drove fast, and estimated it took about 30 minutes or slightly longer to get from San Leandro to Modesto. He parked in front of defendant's house. The front porch and interior stairwell lights were the only ones on.

Dasheme got out of the car, followed by the others. They rang the doorbell for five or six minutes before Johnson finally answered. Johnson sounded upset and asked what they were doing at his house. Dasheme responded that he was there to check on his mother. Johnson, who was inside the house, said something to Dasheme, but Willoughby could not remember what. Dasheme tried to push past Johnson into the house, but Johnson stood in front of him and they started arguing. Johnson was in the living room, and Dasheme managed to step inside the house. Dasheme's right hand was balled up, and his shoulders were angled slightly to the side, like a "stagger stance." Willoughby then heard a pop, and Johnson said, "Don't kill me."

---

gone. Johnson would take the car, and this upset defendant because it interfered with her ability to conduct her church business. (Defendant was the founder and pastor of a church in the Bay Area.) Defendant would get angry and, if she was able to talk to Johnson, she would yell. Although annoyed, Johnson would just "brush[] it off." A couple of times when defendant was angry and she and Johnson were arguing, Willoughby heard her say she was going to call her son. Sometimes Johnson would tense up when defendant said that, although Willoughby did not think Johnson was afraid of defendant's sons.

6.

Willoughby, Vincent, and Crowder ran back to the car, and Crowder yelled at Dasheme to come on. Dasheme then also got in the car. Willoughby started driving, then Dasheme turned and asked who was going to be the first person to fold, meaning to start talking. He was waving his gun back and forth, with the barrel pointing at the other three, at the time. Willoughby said nobody was going to do that. He then drove back to San Leandro and dropped everyone off.

Vincent recalled being at the San Leandro apartment when Dasheme received the telephone call from defendant. Vincent got the impression there was an altercation going on, and Dasheme was trying to find out what was happening. Then there was a second call, after which Dasheme seemed agitated, frustrated, and angry. He said defendant was having a little trouble, so they were going to go to Modesto. Dasheme did not say what he was going to do in Modesto, but, on the trip there, Vincent was told Johnson put hands on defendant.[11]

Vincent fell asleep in the car and woke to find them pulling up to defendant's house. Everyone got out of the car. Dasheme knocked on the door, and Johnson answered a short time later. Dasheme still seemed somewhat agitated, although Vincent did not see anything in his hands. When Johnson opened the door, Dasheme "burst" inside. Dasheme was directly inside the door, and Johnson was backed into the living room. Johnson, who had nothing in his hands, asked what was going on. Dasheme said he knew what was going on — he was beating defendant. Vincent then saw the gun come from Dasheme's right side. Johnson told Dasheme not to shoot him, but Dasheme fired once at Johnson. Johnson grabbed his chest and appeared surprised. He asked why Dasheme did it.

---

[11] Vincent described Johnson as a good family man who always had a smile on his face. Vincent never heard him raise his voice or saw him raise his hand to anybody. Vincent was surprised to hear something was going on between Johnson and defendant.

7.

Johnson was on his knees, hunched over in a fetal position. Dasheme was "right over him," with the gun pointed at Johnson's head. Dasheme fired again, but the gun jammed. Defendant ran downstairs, wearing pajamas. She was hysterical and asked Dasheme, "Why did you do that? Why did you shoot him?" She told Dasheme and the others to get out of there now. Once they were back in the car, Dasheme waved his gun around and told the others to keep their mouths shut.

During the drive back to San Leandro, defendant called and said Johnson was fighting for his life and she was at the hospital. She was in tears. Dasheme told defendant he was tired of Johnson doing "it" to her, and she was the one who told Dasheme to come down there and make sure everything was all right.

Vincent spoke with Dasheme a day or two after the shooting. Dasheme said defendant called him and had him come and do something to Johnson. Defendant later essentially told Vincent the police had no leads or information, so Vincent should just keep quiet. At some point, Vincent overheard a conversation between Dasheme and Deleon, about Dasheme needing to get rid of his gun and the best way to do it.

Barnes had considered defendant to be a mother figure to him since he was a child. Dasheme and Deleon were like brothers to him. Barnes lived with defendant and Johnson at their Modesto home for several months during 2008. Barnes was aware Johnson struggled with drug addiction. Sometimes, he would leave the house and take the car. This made defendant angry and she would go find him or call people in the area she knew him to frequent. Defendant was vocal about her anger. Barnes sometimes saw defendant and Johnson argue. Defendant was the primary aggressor. Barnes never saw Johnson lay a hand on her.

Barnes considered defendant to be closer to Dasheme than to Deleon. She and Dasheme had a bond, and Dasheme "[a]bsolutely" felt protective of her. From Barnes's observations, defendant knew how much Dasheme loved her, and she was very involved in his life. Dasheme wrote and performed rap music. Its content varied, but included

8.

him talking about street violence, guns, and shooting people. Defendant was Dasheme's agent and producer.

On the night of August 29 to August 30, Barnes met up with defendant and Johnson in the Bay Area and was going to spend the night at their Modesto home. Upon reaching the house, Barnes took Johnson's truck to go to the grocery store. The others were playing dominoes and everyone appeared to be having fun. When Barnes returned 15 to 20 minutes later, however, the mood in the house was "[t]otal tension" between defendant and Johnson. Defendant said Johnson had gotten upset because of a comment someone made about him at church.

Defendant went upstairs to clean her room, and Barnes went out onto the front porch to make a phone call. He was on the phone with a friend for about an hour, at which point he heard doors slamming upstairs and defendant and Johnson arguing. He could not hear what was being said.

Barnes remained on the phone outside, then Johnson opened the front door and asked him for a cigarette. Barnes knew Johnson did not smoke, but gave him a cigarette anyway. Johnson then went back inside and closed the door. Barnes then heard more arguing and slamming doors. Defendant's mother went up the stairs and there was silence for a few minutes, then Barnes saw Johnson "fly" downstairs with defendant behind him. Defendant was swinging at Johnson, who was backing up, trying to get out of the way, and she turned over the coffee table in the living room. She was saying something like, "You want to challenge me?"

Defendant swung again, and Johnson grabbed her by the biceps and sat her on the couch. He did not strike her. She got back up and started swinging again, and he sat her down again in the same manner. He asked, "Is this what you want me to do? Is this what you want me to do?"

9.

Barnes went inside and asked them what was going on.  He did not recall what, if anything, they responded, but defendant went upstairs and into her room.[12]  Barnes then went back outside and got on the phone with his friend.  He talked to her for about 30 minutes, during which time he heard more slamming doors and arguing, although he did not see defendant or Johnson.  Defendant's mother went upstairs and came back down, after which everything was quiet for 30 minutes to an hour.

Barnes subsequently came back inside.  At some point, when he and defendant were in the living room and Johnson was elsewhere, Barnes heard defendant on the phone with Dasheme.[13]  Defendant told Dasheme she was five-foot-six or five-foot-seven, a little woman, and this "big old man" was beating on her.  She said she was scared for her life, and told Dasheme, referring to Johnson, "Come handle this [epithet]."

Barnes demanded to know what she did that for, and told her, "You fucked up." Defendant replied, "I know.  I know."  Barnes told defendant she should call Dasheme back and tell him not to come.  He knew that if Dasheme got there, "it was gonna be a whole bunch of mess."  Barnes thought Dasheme and Johnson were going to fight, but he never thought Dasheme would shoot Johnson.  As far as he knew, Johnson and Dasheme got along.  Defendant tried to call Dasheme, but Dasheme's phone was off.  At some point, Barnes also tried to call Dasheme, but never got through to him.

After Barnes heard defendant talking to Dasheme, he heard her tell Johnson that she had called her son and he would handle this.  Johnson said she should call her sons; if they shot him, he would shoot them back, and if they stabbed him, he would stab them back.  Shortly after, Johnson started looking for his car keys.  Defendant had them.  She

---

[12]    Barnes believed defendant was intoxicated because, although he did not see her drinking, there were alcohol bottles upstairs and her attitude changed, so that she became more combative, when she drank.

[13]    It is unclear when, in the chronology of events preceding the shooting, this took place.

did not give them to Johnson. At some point, Barnes overheard defendant tell Newton she had called Dasheme. Barnes could tell Newton was worried about that.

Defendant told Barnes and Johnson that when Dasheme arrived, she and they would not answer the door. She said to act like nothing happened. Barnes continued to plead with defendant to call Dasheme and tell him it was not serious and not to come.

Later, Barnes was upstairs in the master bedroom, along with defendant, Johnson, and Crystal Pettis. Everyone seemed to be getting along, so Barnes thought the incident was over and he was no longer particularly concerned Dasheme would show up at the house. After a time, while they were discussing a lesson defendant was going to teach the next morning at a church, the doorbell rang. Johnson, who was on the computer, said, "Somebody's at the door." Defendant, who was lying in bed, responded, "Well, you're bad. Go answer it."

Johnson went to answer the door, and defendant followed some 10 to 20 seconds later.[14] Barnes thought Dasheme was there, so he looked out the upstairs window. When he saw Willoughby's car, he opened the window and called out that it was not that serious and to go home. Nobody responded. Barnes heard the front door creak open and Johnson saying, "No, no." Almost immediately, he heard a gunshot. He then heard defendant saying, "Oh, my God, Karl's been shot."

---

[14] Barnes believed Johnson had a box cutter in his shorts. One was turned over to police with his clothes after his death. In one of her interviews with police, defendant related that Johnson had worked for a grocery store more than a year before his death, and that, as a result of his employment, he had gotten into the habit of carrying a box cutter in his pocket. Defendant said Johnson kept the box cutter on his person for his protection.

Martha Holt was Johnson's sister. Sometimes when Johnson was in trouble, he would telephone Holt in the middle of the night, and she would offer him a place to go. Around 4:30 a.m. on August 30, Holt received a call, but, because she was sleeping, it went to voicemail instead of being answered. Caller identification showed the call was from Johnson's cell phone. Holt tried to call Johnson back, but got no response.

Barnes went downstairs. There was blood from the right side of the staircase, back through the living room and kitchen. Johnson was lying on the linoleum and the carpet between the living room and kitchen. He was a pale blue, and there was blood on the shirt covering his abdomen. Defendant was with him, holding him and slapping him to try to wake him up. She told him she loved him and was sorry.

Barnes got some towels to try to compress the wound, then called 911 when he realized nobody else had done so. When he told the 911 operator someone had been shot, defendant told him not to say that. Later, at the hospital, defendant told Barnes not to say anything about Dasheme being at the house.

At approximately 4:47 a.m. on August 30, officers were dispatched to defendant's home in response to a call of a shooting that had just occurred. Upon arrival, they found the front door open. Inside, Johnson was lying, conscious, on the floor in the kitchen area. Defendant was kneeling next to him. She was hysterical and yelling, "He's been shot, help him." Officer Beavers observed a gunshot wound to the right side of Johnson's chest area and another to his right bicep. Defendant said the shooting had occurred at the front door, when Johnson went to answer it in response to the doorbell ringing. However, although there was a blood trail leading from the couch in the living room area to the kitchen entryway where Johnson was located, there was no blood in the area of the front door. When Beavers asked if defendant knew who did it, she said no.[15]

Johnson died at 7:23 that morning. His blood-alcohol content was 0.14 grams. An autopsy revealed a gunshot wound to the right side of his abdomen. The bullet penetrated the abdominal cavity, liver, small and large intestines, mesentery, and abdominal aorta, and was lodged in the left side of the abdominal wall. There was also a through-and-through gunshot wound to the upper right arm, just above the elbow. The

---

[15] A police officer who spoke with defendant around 5:20 a.m. noticed a strong odor of alcoholic beverage emanating from her person.

cause of death was gunshot wounds to the abdomen and right arm, with excessive loss of blood.

Detective Stanfield spoke with defendant at the hospital shortly after 8:00 a.m. Defendant was crying and shaking. Defendant related that she and Johnson were upstairs around 3:30 a.m. Defendant was working on a class she was preparing to teach for Sunday school, while Johnson was using the computer. Johnson said he heard the doorbell ring and defendant thought it was a knock, and they both kind of laughed about the fact someone was at the door at that hour of the morning.[16] Johnson went downstairs to answer the door, and as defendant went down the stairs after him, she saw Johnson staggering back to the sofa. He said he had been shot. Defendant told Stanfield she did not hear any gunshots or any cars driving away.[17] She assisted Johnson to the kitchen/dining room area and started administering first aid while 911 was called. The paramedics then arrived and transported Johnson to the hospital.

Later that morning, defendant agreed to go to the police department to give a statement. She was not under arrest. Her demeanor during the interview was friendly and helpful, though tired and depressed. During the course of the interview, defendant gave her sons' names as Deleon Abdul Hosley and Kareme Hosley. She said Kareme did

---

[16] According to what defendant told Froilan Mariscal, an investigator for the district attorney's office, about 9:00 that morning, defendant and Johnson debated who should go down and answer the door. Defendant said Johnson did not feel like going downstairs, but she kept pushing him to do it until he finally agreed. When Mariscal asked defendant if she had any idea who might have shot Johnson or any reason somebody would want to shoot him, defendant replied, "Me and Karl [Johnson] have had our differences." She then said she did not know anyone who would want to shoot him.

[17] At approximately 4:30 a.m. on August 30, Patrick Collins, who lived nearby, was awakened by what sounded like boxes falling and hostile voices. He then heard what he believed to be three gunshots. He saw a car take off. The car had a loud exhaust system.

13.

not have a middle name.[18]  She said he lived in Oakland, but she did not know exactly where.  She said she did not see him often and did not know his phone number.  When Detective Evers looked through defendant's cell phone, Dasheme's name and number were there.  Defendant also initially said Barnes did not have a cell phone, but identified a number as his once Evers found it in her cell phone's memory.  Defendant told Evers that, before coming to the police station, she erased most of the calls placed on her phone in order to save memory.  There were no calls on her phone's call list prior to 12:17 p.m. on August 30.

During the interview, defendant informed Detective Grogan there was no domestic violence in her relationship with Johnson, and Johnson had never struck her.  Grogan saw no signs on her person of a physical altercation.

Grogan conducted a second interview with defendant on September 25, following her arrest.  During this interview, defendant said she and Johnson had had an argument starting shortly after they arrived home around 11:00 p.m. on the night of the shooting, and continuing until around 2:00 a.m.  Defendant first said Johnson was getting ready to leave, and she grabbed him to stop him.  He put up his hands as if to say not to touch him.  Defendant said neither of them hit the other.  Later in the interview, however, defendant said that when she grabbed defendant to stop him, he turned and grabbed her by the throat.  They then lost their balance and fell over the coffee table and onto the couch.  Defendant continued to maintain she was in the stairwell when Johnson was shot and did not see who did it.

During this interview, defendant said she talked to "Kareme" the night before the shooting.  She first said she spoke to him about a family barbecue she was planning.  Later, she said she had been upset because of her argument with Johnson, and had told

---

**18**    Dasheme's full name is Dasheme Kareme Hosley.  Barnes called him "Dasheme."  Barnes heard defendant call him "Kareme," but only occasionally.

14.

"Kareme" she was tired of "this struggle." She said he would understand she meant Johnson and their troubles over finances and Johnson's not working. She said she was crying and upset when she called, and told her son she had been choked. Confronted with the fact she was not referring to her son by his true name, defendant explained that Dasheme's behavior seemed to have changed, and so she started to call him "Kareme" later in his life. When informed there were telephone intercepts in which she told people to call him "Kareme," defendant said she thought everyone should call him that name from that point on.

Defendant told Grogan that when she saw Johnson back away from the front door, she went to help him and he collapsed. She pulled him toward the kitchen because she wanted to see his injury in the light. Asked why she did not turn on the light in the living room, defendant said she was not thinking about it at the time.

Defendant said she did not know when Johnson's call to his sister was made. Asked about calls to Dasheme that were placed after that call, defendant said she called Dasheme on two occasions to let him know she was okay. She said she hung up before she reached Dasheme and did not speak to him.

At some point, defendant admitted she was suspicious Dasheme was involved and may have shot Johnson because he was protective of defendant. Defendant said she held this belief early in the investigation.[19] Although Grogan had given defendant an update on the case on September 10 and had discussed possible leads and motives with her at that time, defendant never mentioned her suspicions about Dasheme.

Phone records and cell tower information led to wiretap warrants targeting defendant's and Dasheme's cell phones. Evidence of phone records, text intercepts, phone conversation intercepts, and cell tower information regarding the location of cell

---

[19] Defendant was aware Dasheme had been arrested a few days before this interview.

15.

towers servicing particular calls was presented.[20]  The evidence corroborated portions of the testimonies of Crowder and Willoughby, as well as Vincent and Newton.

## II

### DEFENSE EVIDENCE

Detective Munoz interviewed Barnes on three occasions.  Barnes told Munoz several times that he was scared.  Barnes said he called 911 after defendant shouted for someone to call and also told Barnes directly to call.  With respect to the physical scuffle between defendant and Johnson, Barnes related that Johnson grabbed defendant by both arms, shook her, and then threw her down to the couch.  Defendant got back up and knocked over the coffee table, whereupon Johnson threw her back down.  Barnes told Munoz he had never seen Johnson shake defendant the way he did.  Barnes also told Munoz that defendant said she called Dasheme.  Barnes said he was present when she made a phone call to Dasheme, and he overheard her say, "Um, son, Momma's got it. Momma's okay.  Momma's all right.  Don't come here."

## DISCUSSION

## I

### SUFFICIENCY OF THE EVIDENCE

Defendant contends the evidence is insufficient to sustain her murder conviction. We find the evidence sufficient to establish implied malice murder; accordingly, the conviction stands.

The applicable legal principles are settled.  The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt.  (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)  Substantial

---

**20**     Audio recordings of some of the intercepted calls were played for the jury.

16.

evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). "'"Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the … jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citations.]"' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 361.) "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence. [Citations.]" (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.) This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

Defendant's jury was instructed that a person could be guilty of a crime in two ways: either as the direct perpetrator, or by aiding and abetting a perpetrator who directly committed the crime. (See § 31; *People v. Maciel* (2013) 57 Cal.4th 482, 518.) With respect to aiding and abetting, jurors were told:

> "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:
>
> "Number one, the perpetrator committed the crime;
>
> "Number two, *the defendant knew that the perpetrator intended to commit the crime*;
>
> "Number three, before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime; and

"Four, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does in fact aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime." (Italics added.)

Defendant says that while there potentially was *some* evidence, there was no *substantial* evidence to establish the second element, that she knew Dasheme intended to kill Johnson.[21] We need not decide whether defendant is correct, because, on the facts of this case, jurors could not have concluded defendant knew Dasheme intended to kill Johnson — or herself harbored an intent to kill — without also concluding defendant premeditated and deliberated. Because jurors convicted defendant of second degree murder, not first degree murder, it necessarily follows they convicted her based on a theory of direct, rather than derivative, liability (see *People v. Perez* (2005) 35 Cal.4th 1219, 1226), and found she acted with implied malice. Since, as we will explain, there was sufficient evidence to support defendant's conviction on an implied malice theory, any evidentiary insufficiency with respect to the elements of aiding and abetting does not require reversal. (See, e.g., *People v. Rundle* (2008) 43 Cal.4th 76, 140-141, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v.*

---

[21] Jurors were instructed on natural and probable consequences only in terms of causation. They were not instructed on the natural and probable consequences doctrine as it relates to aider and abettor liability. (See generally *People v. Prettyman* (1996) 14 Cal.4th 248, 261-262.) Thus, they were not instructed on assault as a target crime for purposes of murder, but merely in terms of it being the crime committed for purposes of involuntary manslaughter. "'[O]utside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator,' and when the crime is murder, the 'aider and abettor must know and share the murderous intent of the actual perpetrator.' [Citation.] '[A]n aider and abettor will "share" the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.' [Citation.]" (*People v. Maciel, supra,* 57 Cal.4th at p. 518.)

18.

*Aguilar* (1997) 16 Cal.4th 1023, 1034; *People v. Guiton* (1993) 4 Cal.4th 1116, 1129, 1130; *People v. Calderon* (2005) 129 Cal.App.4th 1301, 1306-1307.)[22]

"Malice is implied when the killing is proximately caused by '"an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life."'  [Citation.]  In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another .…"  (*People v. Knoller* (2007) 41 Cal.4th 139, 143.)  Defendant's jury was instructed:

> "The defendant acted with implied malice if:
>
> "One, she intentionally committed an act;
>
> "Two, the natural and probable consequences of the act were dangerous to human life;
>
> "Three, at the time she acted she knew her act was dangerous to human life; and
>
> "Four, she deliberately acted with conscious disregard for human life."

Viewed in the light most favorable to the prosecution, the trial evidence showed defendant deliberately set in motion the events culminating in Johnson being killed.  She intentionally lied to Dasheme, telling him Johnson had beaten her, and ordered him to

---

[22]    In arguing the evidence was insufficient, defendant focuses only on the evidence arguably supporting her position.  "[T]o prevail on a sufficiency of the evidence argument, the defendant must present [her] case to us consistently with the substantial evidence standard of review.  That is, the defendant must set forth in [her] opening brief *all* of the material evidence on the disputed elements of the crime in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict.  [Citation.]  If the defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then [she] cannot carry [her] burden of showing the evidence was insufficient because support for the jury's verdict may lie in the evidence [she] ignores."  (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574.)

19.

come and "handle" Johnson. She told Dasheme this while knowing he was protective of her, could be violent, and possessed (or at least had access to) a firearm. Defendant herself could be violent, and had told Johnson on more than one occasion that she would call her sons to handle matters. Although Dasheme and Johnson normally had a decent relationship and Johnson usually may not have considered this to be a threat, he himself recognized the potential for violence when he talked about shooting or stabbing Dasheme back if Dasheme shot or stabbed him. Johnson tried to leave, but defendant deliberately thwarted his attempt. Barnes and Newton both were concerned Dasheme would bring violence to the house, and defendant recognized she did wrong by calling and lying to him. A rational juror could infer she too was concerned about the potential for violence, otherwise she would not have felt the need to plan what to do upon his arrival and to tell Barnes and Johnson that she and they would not answer the door. Although she apparently tried to call Dasheme off, she knew she had not succeeded. Yet, when Dasheme arrived — and, given the early hour of the morning, jurors reasonably could have inferred she knew it could only be Dasheme — she sent Johnson to answer the door, even though she knew or should have known Dasheme would want to see for himself that she was well. Although defendant was not the actual killer, her culpability arose from her own conduct and mental state (see *People v. McCoy* (2001) 25 Cal.4th 1111, 1120), which were such that a rational trier of fact could conclude she committed implied malice murder.

## II

### ALLOWING JACOBSON TO TESTIFY AS AN EXPERT

As described in the statement of facts, *ante*, evidence of telephone records, text intercepts, and phone conversation intercepts gained as the result of a wiretap, were admitted into evidence. Most of this evidence came before the jury through the testimony of Steven Jacobson, a senior detective/criminal investigator for the district attorney's office. Defendant says the trial court erred by permitting Jacobson to testify as

an expert witness without being duly qualified, and by treating him as an expert before the jury without certifying his expertise. She says the error was prejudicial because Jacobson provided the sole corroboration for the accomplice testimony of Crowder and Willoughby, testimony without which defendant would not have been convicted. We agree with the Attorney General that the claim has been forfeited by defendant's failure to object at trial, and is without merit in any event.

## A.    Background

At the outset of Jacobson's testimony, the prosecutor elicited Jacobson had been a detective with the district attorney's office for over 11 years, and was a law enforcement officer for three county agencies before that. Jacobson's specialty was "going through phone records and wire intercepts, or wire taps or phone taps." Asked if he had any background or training with regard to conducting investigations using wiretap evidence, Jacobson related that he worked on some wire intercept cases with the federal government — specifically DEA and FBI — in 1999. After he received some on-the-job training and experience with them, he returned to Stanislaus County, which had its first state wire intercept in 2000. Jacobson had been "doing this ever since, since about 2000." He had received training based on the intercept system itself and the technical and practical aspects of how that system worked, and had also received legal training from the district attorney's and Attorney General's offices. Jacobson explained that a law enforcement officer must complete a mandatory course administered by the Department of Justice before he or she is able to initiate wire intercepts, and must be certified by that course before he or she can participate in a wiretap investigation, and that he had been so certified. The prosecutor further elicited Jacobson had worked between 15 and 20 wiretaps, and she had him explain some of the statutory mandates and requirements for obtaining wire intercepts.

When the prosecutor moved on from that subject and asked if Jacobson was asked to participate in this case "in terms of [his] expertise and [*sic*] wiretap evidence,"

21.

defendant did not object, ask to voir dire the witness, or ask the trial court expressly to rule whether Jacobson was qualified as an expert. Similarly, when the prosecutor subsequently asked Jacobson to explain how cell towers worked and how he was able to make a determination what tower was servicing a particular call, Jacobson did so without objection. In fact, on cross-examination, defense counsel elicited that, generally speaking, Jacobson was "the point man for local law enforcement" on investigations dealing with telephone intercepts, wiretaps, and the like, and that he had years of experience working with phone companies to figure out their codes and procedures.

In her argument to the jury, the prosecutor explained about the requirement that accomplice testimony be corroborated. She observed Barnes and Vincent were not accomplices, but told jurors the "number one thing" supporting Crowder's and Willoughby's accounts of what happened the night Johnson was shot were the phone records, wiretaps, and text messages from that night. The trial court subsequently instructed the jury on, inter alia, expert testimony and the testimony of accomplices.

## B.     Discussion

"A trial court's decision to admit expert testimony is reviewed for abuse of discretion. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 45.) "[A]lthough expert testimony is generally inadmissible on topics 'so common' that jurors of ordinary knowledge and education could reach a conclusion as intelligently as the expert, an expert may testify on a subject about which jurors are not completely ignorant. [Citations.] In determining the admissibility of expert testimony, 'the pertinent question is whether, even if jurors have some knowledge of the subject matter, expert opinion testimony would assist the jury.' [Citations.]" (*Ibid*.)

Defendant acknowledges telephone records, cell towers, and wiretaps are often the subject of expert testimony. (See, e.g., *People v. Tran* (2013) 215 Cal.App.4th 1207, 1212; *People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1544.) She says, however, the

trial court erroneously permitted Jacobson to testify as an expert without his being duly qualified and without certifying his expertise to the jury.

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. *Against the objection of a party*, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert." (Evid. Code, § 720, subd. (a), italics added.)  Because she raised no challenge to Jacobson's qualifications at trial, defendant has forfeited her claim and so is precluded from raising it on appeal.  (*Id*., § 353; *People v. Dowl* (2013) 57 Cal.4th 1079, 1087; *People v. Panah* (2005) 35 Cal.4th 395, 478; *People v. Ramos* (1997) 15 Cal.4th 1133, 1171; *People v. Roberts* (1992) 2 Cal.4th 271, 298; *People v. Mickey* (1991) 54 Cal.3d 612, 669; *People v. Hogan* (1982) 31 Cal.3d 815, 852, disapproved on another ground in *People v. Cooper* (1991) 53 Cal.3d 771, 836.)

Defendant insists the issue has not been forfeited.  First, she cites *People v. Williams* (1998) 17 Cal.4th 148, 161-162, footnote 6, for the proposition that an appellate court retains authority to reach a question not preserved for appeal.  Although this is generally the case, the footnote points out that we are barred from doing so when, as here, the issue involves the admission of evidence.

Second, defendant says a trial court's complete failure to exercise the discretion vested in it by law is also subject to review on appeal absent an objection.  While this is sometimes true, cases so holding do not concern the type of issue presented here — the admission of evidence.  (See, e.g., *In re Sean W.* (2005) 127 Cal.App.4th 1177, 1181-1182 [juvenile court erroneously did not believe it had any discretion regarding the setting of minor's maximum term of confinement]; *Fletcher v. Superior Court* (2002) 100 Cal.App.4th 386, 392 [in ruling on discovery motion, trial court failed to apply law to facts]; *People v. Downey* (2000) 82 Cal.App.4th 899, 912 [trial court's sentence choice was based on erroneous understanding of law].)  "Ordinarily a court cannot commit error

23.

in the admission of evidence unless it is called upon to *rule* on an *objection* by a party. [Citation.] The court may of course exclude evidence on its own motion, but it will ordinarily do so only if it finds the evidence wasteful of judicial resources because, e.g., it is redundant or irrelevant. [Citations.] If proffered evidence is relevant, courts will rarely if ever exclude it sua sponte merely because it may fall within some exclusionary rule." (*People v. Viray* (2005) 134 Cal.App.4th 1186, 1208.)

Defendant points to *People v. King* (1968) 266 Cal.App.2d 437, 444, which states: "'Before a witness advanced as an expert is permitted to give his opinion, his qualifications must be passed on by the court. The party who produces the expert first examines him on his qualifications. Then the opposing party has the right to conduct a voir dire examination on his qualifications. After this the *trial judge* determines whether the witness is an expert and can testify.…'"

Here, the prosecution examined Jacobson on his qualifications. Defendant did not seek to voir dire Jacobson or otherwise challenge his qualifications or expertise. The trial court was not required to raise the issue on its own motion. Nor, under the circumstances, was it required expressly to pass on Jacobson's qualifications. An implied finding — which, absent record evidence to the contrary, we presume it made (see Evid. Code, § 664; *Ross v. Superior Court* (1977) 19 Cal.3d 899, 913) — was sufficient (see *Graham v. Flory* (1955) 134 Cal.App.2d 729, 732).

The trial court did not abuse its discretion by implicitly determining Jacobson was qualified to testify as an expert on the subject to which his testimony related. (See *People v. Hogan, supra,* 31 Cal.3d at p. 852.) "[T]he decision of a trial court to admit expert testimony will not be disturbed on appeal unless a manifest abuse of discretion is shown. [Citation.]" (*People v. Roberts, supra,* 2 Cal.4th at p. 298.) "Error regarding a witness's qualifications as an expert will be found only if the evidence shows that the witness ""*clearly lacks* qualification as an expert.""" [Citation.]" (*People v. Farnam* (2002) 28 Cal.4th 107, 162.)

24.

Defendant states the "sum total" of Jacobson's qualifications were that his specialty was analyzing phone records and wire intercepts, and he was the "point man" for local law enforcement when it came to those subjects. Defendant asserts Jacobson "did not discuss his training, experience, education, or any other fact that would tend to show that he was qualified to testify as an expert." As can be seen from our recitation of the pertinent testimony, *ante*, this misrepresents the record.[23] Given Jacobson's background and experience, we would not have disturbed the trial court's decision to admit his expert testimony even if defendant had timely challenged Jacobson's qualifications. (See *People v. Roberts, supra,* 2 Cal.4th at pp. 298-299; cf. *People v. Gonzalez* (2006) 38 Cal.4th 932, 949, fn. 4; *People v. Ochoa* (2001) 26 Cal.4th 398, 438, disapproved on another ground in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14; *People v. Doss* (1992) 4 Cal.App.4th 1585, 1595.)

Since Jacobson was clearly qualified to testify as an expert and the trial court did not abuse its discretion in admitting his testimony, it follows the court properly instructed the jury concerning expert testimony. Even if we assume it would have assisted jurors to have Jacobson expressly declared an expert, the trial court's failure to do so cannot possibly have prejudiced defendant.

### III

### PROSECUTORIAL MISCONDUCT

Defendant identifies what she claims are multiple instances of prosecutorial misconduct that prejudiced her right to a fair trial. We find no reversible error, whether the instances are viewed individually or cumulatively. (See *People v. Kennedy* (2005) 36 Cal.4th 595, 627, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th

---

**23** An attorney in this state has a duty, inter alia, "[t]o employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law." (Bus. & Prof. Code, § 6068, subd. (d).)

405, 459; cf. *In re Price* (2011) 51 Cal.4th 547, 560 [touchstone of due process analysis in cases of alleged prosecutorial misconduct is fairness of trial, not culpability of prosecutor].)

The applicable legal principles are settled. "Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such "'unfairness as to make the resulting conviction a denial of due process.'" [Citation.] By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and '"it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct"' [citation]." (*People v. Davis* (2009) 46 Cal.4th 539, 612.) "A finding of misconduct does not require a determination that the prosecutor acted in bad faith or with wrongful intent. [Citation.]" (*People v. Kennedy*, *supra*, 36 Cal.4th at p. 618.)

"When a claim of misconduct is based on the prosecutor's comments before the jury, … "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" [Citations.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.) "In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

"To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct, unless an admonition would not have cured the harm. [Citation.]" (*People v. Davis, supra,* 46 Cal.4th at p. 612.) "When a defendant makes a timely objection to prosecutorial argument, the reviewing court must determine first whether misconduct has occurred, keeping in mind that "'[t]he prosecution has broad

26.

discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom"' [citation], and that the prosecutor 'may "vigorously argue his case" …, "[using] appropriate epithets warranted by the evidence."' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 752-753.) If misconduct occurred, we then determine whether it was prejudicial under state law or the federal Constitution. (*Id*. at p. 753.) Where the trial court has ruled on the issue, we generally review that ruling for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.) The same standard applies to our review of a trial court's ruling on a motion for mistrial based on prosecutorial misconduct. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1154; *People v. Hayes* (1990) 52 Cal.3d 577, 610.)

A.    **Defendant's Custodial Status**

1.    Background

The prosecutor questioned Willoughby concerning, among other things, a conviction he suffered after entering into the plea agreement in the present case. This followed:

"Q. Since being released from jail, have you had any contact with [defendant]?

"A. No.

"Q. *Have you visited her at all here in the county jail?*

"A. No.

"Q. Did you have any contact with her son?

"A. No.

"Q. Did you ever receive letters from her after she was arrested?

"A. No.

"Q. Did you ever receive any phone calls before all of you had been arrested?

27.

"A.  No."  (Italics added.)

At the next break, defense counsel moved for a mistrial.[24]  He asserted the question whether Willoughby visited defendant in the county jail was inappropriate and prejudiced defendant by communicating her custodial status to the jury.  The trial court denied the motion, explaining:  "[Defendant] obviously is in civilian clothing and has been shielded from the jury as best we possibly can.  I felt [the prosecutor's] question was very open ended and didn't refer to any specific time frame.  She had referred to other defendants having been arrested as well.  I don't think the jury would -- I don't think it would call attention to the fact that your client is in custody at this point in time.  [¶]  So I do not think a mistrial is required."

2.      Analysis

A prosecutor commits misconduct by intentionally eliciting inadmissible testimony.  (*People v. Smithey* (1999) 20 Cal.4th 936, 960.)  However, whether Willoughby had contact with defendant after the shooting was a legitimate subject of inquiry, and "'the mere fact that the jury is made aware of a defendant's custodial status does not deprive the defendant of [her] constitutional rights.'  [Citation.]"  (*People v. Ledesma* (2006) 39 Cal.4th 641, 681; see also *People v. Bradford* (1997) 15 Cal.4th 1229, 1336.)  Here, the prosecutor's question was ambiguous in terms of conveying to the jury defendant's present custodial status (see *People v. Collins* (2010) 49 Cal.4th 175, 199), and other testimony enforced the ambiguity.[25]  Moreover, jurors were instructed, at

---

[24]     Defense counsel apparently informed the court and prosecutor of his desire to so move at the completion of the prosecutor's direct examination of Willoughby, but did not object at the time the offending question was asked due to his desire not to call the jury's attention to it.

[25]     For example, the prosecutor asked Crystal Pettis if she continued to socialize with defendant "[s]ince" the shooting.  Pettis confirmed she continued to be defendant's friend and to spend time with defendant.  Referring to Pettis, the prosecutor asked Barnes, "And she *is* around [defendant] a lot, isn't she?"  (Italics added.)  Barnes answered yes.

the outset of trial, that the fact defendant was arrested, charged with a crime, or brought to trial was not evidence of guilt. At the conclusion of the attorneys' arguments, jurors were told they could not be biased against defendant just because she had been arrested, charged with a crime, or brought to trial. We presume the jury followed these instructions. (See *People v. Mickey, supra,* 54 Cal.3d at p. 689, fn. 17.) At no time did defendant request a more pointed admonition to disregard her custodial status. (See *People v. Ledesma, supra,* 39 Cal.4th at p. 681.)

Under the circumstances, we conclude that, assuming misconduct occurred, it did not prejudice defendant. The incident was simply not significant in the context of the trial as a whole. (See *People v. Bolden* (2002) 29 Cal.4th 515, 555.) It follows the trial court did not abuse its discretion by denying defendant's motion for mistrial, as such a motion should be granted only when the trial court determines a party's chances of receiving a fair trial have been irreparably damaged. (*Ibid*.)

## B.     Defendant's Involvement in Check-Cashing Scheme

### 1.     Background

The prosecutor moved, in limine, to be permitted to impeach defendant with evidence defendant was involved in a fraudulent check-cashing scheme with her children. Although defendant had not been convicted of any crimes in connection therewith, the prosecutor proposed to prove the conduct by using wiretap intercepts of defendant's own statements and conversations, as well as surveillance evidence. The trial court ruled the prosecution could use the evidence if defendant testified.

While the prosecutor was questioning Crowder before the jury, this occurred:

> "Q. Do you remember telling Detective Owen that [defendant] came out three or four times to assist them [*sic*] in moving from one hotel to the other?
>
> "A. Yes.

29.

"Q. And do you remember telling us that after the shooting that Dasheme had a meltdown?

"A. Yes.

"Q. Do you recall telling Detective Owen that … a couple of weeks after the shooting, that you and Dasheme got into an argument where he choked you …?

"A. Yes.

"Q. *Do you recall also talking about the fact that there was a counterfeit payroll check cashing scheme in which Lamar and [defendant] and Danielle and Alisia were all involved in?*

"A. *Yeah --*

"[DEFENSE COUNSEL]: Objection, Your Honor. Can we have a sidebar?" (Italics added.)

The court released the jurors for the weekend, after which defense counsel moved for a mistrial on the ground the prosecutor had violated the court's in limine ruling. The prosecutor acknowledged she made a mistake, but asked the court to reserve ruling until defendant decided whether to testify. The court declined to wait that long, but said it would reserve ruling until Monday to give the parties the opportunity to figure out a way to fix the problem.

The following Monday, the prosecutor filed written opposition to defendant's mistrial motion. The prosecutor argued the elicited testimony was inadvertent, the misconduct could be cured by the court striking the testimony and giving a curative instruction, enough time had passed that there was little likelihood jurors remembered the question and answer, the evidence involved peripheral conduct of defendant and was not material to her guilt or innocence in the present case, the testimony was given on the first day of trial and was not so inflammatory as to deny defendant her right to a fair trial, and the response "cut[] equally" against the People because it included prosecution witnesses as participating in the counterfeiting scheme. The prosecutor appended a declaration,

30.

which stated she was using a law enforcement interview of Crowder (which she also attached as an exhibit) to examine Crowder and, in her haste to finish her questioning before the end of the day, inadvertently questioned Crowder on the previously excluded material.

After argument, the trial court stated: "Well, the objection was made timely, and [the prosecutor] only got a couple words into it in view of the -- your manner which made the objection -- it did not really call additional attention, which goes to your professionalism as to that. I do think it can be cured by rereading the jury instruction regarding evidence. I will sustain the objection and order it be stricken from the record and then reread the evidence instruction to the jury when they get here." Defense counsel responded, "Okay." When the jury was brought into the courtroom, the court stated:

> "And before we pick up where we left off on Friday, at the close of business on Friday, nearing the end of close of business on Friday, [defense counsel] made an objection, and I will sustain his objection and order that the question be stricken from the record.

> "And with that done, let me just reread to you a portion of one of the jury instructions I read to you [at the outset of trial], and then I'll read the two relevant paragraphs to you.

> "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys will discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if you understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asks a question that suggests it is true. During the trial, the attorneys may object to questions asked of the witness. I will rule on the objections according to the law. If I sustain an objection, the witness will not be permitted to answer, and you must ignore the question. If the witness does not answer, do not guess what the answer might have been or why I ruled as I did. If I order testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose."

The post-evidentiary version of the instruction was given after closing arguments.

31.

## 2. Analysis

A prosecutor commits misconduct by referring to facts not in evidence (*People v. Hill* (1998) 17 Cal.4th 800, 827-828), intentionally eliciting inadmissible testimony (*People v. Smithey, supra,* 20 Cal.4th at p. 960), or posing a question that violates a trial court's prior evidentiary ruling, even if he or she does not do so intentionally (*People v. Friend* (2009) 47 Cal.4th 1, 33). Accordingly, the prosecutor clearly erred by asking about the check-cashing scheme.

In light of the single offending reference and immediate objection, followed by the trial court sustaining the objection and striking the offending material without repeating it and then rereading the pertinent instruction, we conclude defendant was not prejudiced. (See, e.g., *People v. Friend, supra,* 47 Cal.4th at p. 33; *People v. Stitely* (2005) 35 Cal.4th 514, 569; *People v. Millwee* (1998) 18 Cal.4th 96, 140.) Likewise, the trial court did not abuse its discretion by denying her motion for a mistrial. (See, e.g., *People v. Avila* (2006) 38 Cal.4th 491, 573-574; *People v. Burgener* (2003) 29 Cal.4th 833, 874.)

## C.     **Questioning of Lamar Vincent**

### 1. Background

On a number of occasions, the prosecutor asked Vincent what he had been told by someone other than defendant. Defendant did not object to all such questions, nor did the trial court sustain all objections that were made. However, the trial court consistently sustained objections to questions designed to elicit the contents of conversations between Vincent and Deleon.

Defense counsel subsequently complained, outside the jury's presence, that he had secured a ruling from the court preventing the prosecutor from eliciting that Dasheme told Vincent defendant was just as guilty for calling Dasheme and having him come do something to her husband. Counsel represented that he had agreed the prosecutor could elicit testimony defendant called Dasheme and told him to come to Modesto, but the prosecutor asked the question in a way that elicited testimony defendant told Dasheme to

32.

come to Modesto and do something to her husband. Defense counsel then moved for a mistrial based on the prosecutor's repeatedly asking questions about Deleon threatening Vincent after the trial court sustained the initial defense objection thereto.

The trial court chastised the prosecutor for saying one thing in chambers and then doing something different in the courtroom, although it noted that had it known originally about the "do something to [Johnson]" portion of defendant's purported statement, it would have ruled that portion admissible. After clarifying for the prosecutor that statements by Deleon had been stricken as third-party hearsay but evidence defendant had told Vincent to keep his mouth shut remained, and ensuring the prosecutor would move on from evidence of any threats, the trial court denied defendant's mistrial motion.

2.      Analysis

It is improper for a prosecutor to persist with a line of questioning after the court sustains an objection thereto, although such conduct does not necessarily "amount to the kind of '"deceptive or reprehensible"' tactic that rises to the level of prosecutorial misconduct. [Citation.]" (*People v. Gonzales* (2011) 51 Cal.4th 894, 920; see *People v. Fuiava* (2012) 53 Cal.4th 622, 683.)

In the present case, the trial court sustained an objection to the offending questions before Vincent could answer, or ordered the objectionable material stricken if Vincent answered before defense counsel could interpose an objection. In addition, as previously described, jurors were instructed multiple times on what constituted evidence. Under the circumstances, defendant was not prejudiced, and the trial court did not abuse its discretion in denying her motion for mistrial. (See *People v. Gonzales, supra,* 51 Cal.4th at p. 921; *People v. Stitely, supra,* 35 Cal.4th at p. 569.)

**D.      Alleged Shifting of Burden of Proof**

1.      Background

In his argument to the jury, defense counsel asserted the law enforcement officers involved in investigating this case "came to some assumptions that led to wrong

33.

conclusions," and that, being human, they made mistakes. He argued defendant committed no crime, but that the worst the evidence showed was involuntary manslaughter. He suggested Johnson's throwing defendant onto the couch showed domestic violence was happening in the household, and someone being harmed by a partner has the right to call for help. Counsel also pointed out that while the domestic issue was occurring, Johnson had a box cutter tucked into his waistband, and he argued the People deliberately presented incomplete evidence to support the conclusion defendant was a murderer. Counsel also reminded the jury that the People had to prove defendant guilty beyond a reasonable doubt, while the defense did not have to prove anything.

In her rebuttal, the prosecutor asked, "Where is the evidence of that?" in regard to defense counsel's argument defendant was the victim of domestic violence. A short time later, this took place:

> "[PROSECUTOR:] Counsel made a big deal about [defendant's attempt to obtain] the frequent flier miles and that she told the detective that she was gonna be leaving for a few days, but she'd leave a number and tell him how he could get a hold of her. [¶] … [¶] Yeah, she was arrested here in Modesto, but that doesn't mean that she wasn't looking to go someplace, that she wasn't looking to get out of town. And that's just a spin on what the real truth of it was.

> "*When there is no defense, you attack the cops*, that's exactly what's going on --

> "[DEFENSE COUNSEL]: Objection, Your Honor. This is burden shifting and commenting on the defense.

> "THE COURT: If you'll refrain from commenting on the defense and keep it to your rebuttal.

> "[PROSECUTOR]: All of the attacks on the cops are also designed so you stop looking at her lies. Attack what the cops said. Then you start focusing on that. Make the cop a liar. Then we're not looking at [defendant] as a liar.…" (Italics added.)

34.

Near the conclusion of the prosecutor's summation, this occurred:

"[PROSECUTOR:] I want to leave you with one instruction the Judge will read to you here in a moment. And you've heard that the burden of proof is on the prosecution numerous times, before you were actually in the box you heard it, you've heard it numerous times throughout our arguments. The People have the burden of proof, and I have the burden of proof beyond a reasonable doubt. But listen to what the instruction says. When you go into that room and you start talking about the evidence, you think about this: Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt.

"And that's the doubt that [defendant] wants you to believe, that possible, that imaginary doubt that she made those phone calls when *there's no proof of those phone calls*, that she didn't know what Dasheme was gonna do when *there's no proof of that*, *that she didn't know* --

"[DEFENSE COUNSEL]: Objection, Your Honor. Impermissible burden shifting.

"[PROSECUTOR]: It's possible, imaginary doubt. It's argument.

"THE COURT: You can argue it, but argue your part, not what defense has or hasn't done.

"[PROSECUTOR]: All of that is possible and imaginary doubt. It's not reasonable doubt.

"To say that [defendant] is a domestic violence, battered woman and that she had to call her son Dasheme to come take care of this guy, she had no reasonable alternatives available to her, that's all possible and imaginary doubt, because that's not what happened here." (Italics added.)

Outside the presence of the jury, defense counsel moved for a mistrial based in pertinent part on what he asserted were instances of impermissible burden shifting when the People said the defense presented no evidence of something. Counsel further asserted the prosecutor engaged in inappropriate argument by saying there was no defense. The prosecutor denied saying the defense had to prove something; rather, she repeatedly said the People had the burden of proof.

35.

The court denied the motion for mistrial, noting the prosecutor was addressing defense counsel's argument. The court observed, "I don't know how she could do that without referring to it as the defense, because that's what it was. It was the defense, your arguments .…"

Defense counsel then asked the court to instruct the jury: "In their final closing, the People commented on defendant's failure to produce evidence and said that there was no defense, period. The defense has no duty to present any evidence, period. The People have a duty to prove every element of the charge and lesser charges beyond a reasonable doubt, period." The prosecutor objected. The trial court declined to give the instruction, stating:

> "The only reason I don't think it's appropriate is because I don't find that [the prosecutor] was engaging in shifting of the burden of proof, and she does make a good point that I stated a number of times to the jury, and she herself did -- one of the first things she said when she got up there with her initial opening was that she had the burden of proof .… And I don't think that she was inferring that the defendant had to put on a defense at all. Again, I think it was just her wording and rebutting your argument with her own.

> "So I don't think an instruction needs to be given other than what will be included in the regular jury instruction."

In the course of instructing the jury, the trial court stated — as it had at the outset of trial — that the presumption of innocence required the People to prove a defendant guilty beyond a reasonable doubt; jurors must decide the facts based only on the evidence presented; and nothing the attorneys said was evidence. The court also told jurors they must follow the law as explained to them by the court, and if the attorneys' comments conflicted with the instructions, jurors must follow the court's instructions. Later, when instructing on what defendant's out-of-court statements could and could not be used to prove, the court reiterated jurors could not convict defendant unless the People had proved her guilt beyond a reasonable doubt.

2. <u>Analysis</u>

In a criminal trial, the prosecution bears the burden of proving guilt beyond a reasonable doubt. (§ 1096; *In re Winship* (1970) 397 U.S. 358, 364.) Accordingly, "[a] prosecutor may fairly comment on and argue any reasonable inferences from the evidence. [Citation.] Comments on the state of the evidence or on the defense's failure to call logical witnesses, introduce material evidence, or rebut the People's case are generally permissible. [Citation.] However, a prosecutor may not suggest that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' [Citations.]" (*People v. Woods* (2006) 146 Cal.App.4th 106, 112; accord, e.g., *People v. Cook* (2006) 39 Cal.4th 566, 608; *People v. Harrison* (2005) 35 Cal.4th 208, 257; *People v. Young* (2005) 34 Cal.4th 1149, 1195-1196.)

Here, "the prosecutor did not cross the critical line, as there is no reasonable likelihood the jurors would have understood the prosecutor's argument as imposing any burden on defendant." (*People v. Young, supra,* 34 Cal.4th at p. 1196.) "A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*People v. Bradford, supra,* 15 Cal.4th at p. 1340; see, e.g., *People v. Redd* (2010) 48 Cal.4th 691, 740 [prosecutor did not commit misconduct by observing there seemed to be no coherent defense to charges]; *People v. Young, supra,* 34 Cal.4th at pp. 1195-1196 [prosecutor did not commit misconduct by arguing no fact other than conjecture and insinuation suggested there was a reasonable interpretation of the evidence that led to defendant's innocence]; *People v. Valdez* (2004) 32 Cal.4th 73, 127 [prosecutor did not commit misconduct by stating there was no evidence presented of any justification or of self-defense].) Even assuming the prosecutor might have worded her argument more artfully, both counsel and the court repeatedly emphasized the burden of proof was on the People. "[H]ad any juror interpreted the [prosecutor's] comments to indicate that defendant had a

37.

burden of proof, this impression would have been dispelled by the instructions and the numerous reminders to the jurors that the People bore the burden of proving defendant's guilt. [Citation.]" (*People v. Redd, supra,* 48 Cal.4th at p. 740; accord, *People v. Bradford, supra,* 15 Cal.4th at p. 1340.)

Under the circumstances, the trial court did not err by denying the motion for mistrial or refusing to give defendant's special instruction.

## IV

### INEFFECTIVE ASSISTANCE OF COUNSEL

Last, defendant contends she received constitutionally inadequate assistance of counsel. Specifically, she faults her trial attorney for failing to (1) object to the prosecutor's asking of inappropriate and leading questions, which, she says, led to the admission of prejudicial information; (2) object to Jacobson being allowed to testify as an expert; and (3) cross-examine key witnesses. In this latter regard, she particularly points to Barnes and his testimony about overhearing defendant tell Dasheme to come handle Johnson.

The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.)

"If the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 367.) In other words, "in assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal*, competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice. [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260, original italics.)

Whether to object to arguably inadmissible evidence or to allege impropriety on the part of the prosecutor are inherently tactical decisions; hence, failure to object rarely establishes counsel's incompetence. (*People v. Maury* (2003) 30 Cal.4th 342, 415-416, 419.) Similarly, matters such as how vigorously or extensively to cross-examine particular witnesses "are normally left to counsel's discretion and rarely implicate inadequacy of representation. [Citations.]" (*People v. Cox* (1991) 53 Cal.3d 618, 662, fn. omitted, disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

On the record before us, we are unable to conclude there could be no satisfactory explanation for trial counsel's challenged acts and omissions. (*People v. Bell* (1989) 49 Cal.3d 502, 546; see, e.g., *People v. Harris* (2008) 43 Cal.4th 1269, 1285; *People v. Chavez* (1968) 262 Cal.App.2d 422, 432.) Since our review on direct appeal is limited to the four corners of that record (*People v. Cunningham, supra,* 25 Cal.4th at p. 1003; *People v. Barnett* (1998) 17 Cal.4th 1044, 1183), defendant's claim fails.

## **DISPOSITION**

The judgment is affirmed.

_____
DETJEN, J.

WE CONCUR:


_____
CORNELL, Acting P.J.


_____
GOMES, J.